**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PLAINTIFF OLIVIA BORNSTEIN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | **No. 20-cv-11118-RGS** |
| v. | |
| TRUSTEES OF BOSTON UNIVERSITY, | |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Olivia Bornstein ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Trustees of Boston University ("Defendant," the "University" or "BU"). Plaintiff makes the following allegations upon personal knowledge, information and belief, and her attorneys' investigation, alleging as follows:

## NATURE OF THE CASE

1.     This action is brought on behalf of students at Boston University who seek a fair adjustment of the top-dollar tuition the University retains despite the termination of in-person instruction, and the loss of related access, benefits, and services during the Spring 2020 semester due to the COVID-19 pandemic.

2.     On March 17, 2020, through a news release from President Robert A. Brown, BU announced that because of the COVID-19 pandemic, all in-person classes would be held remotely through online formats through the end of the Spring Term. President Brown acknowledged to students in his March 17 announcement that "***online delivery is not a substitute for living and***

*learning in our academic community*" (emphasis added).[1] "[W]e have held open the hope that we might be able to safely return to in-person instruction in the second half of April," he said, but "[t]his hope now seems to be unrealistic."[2] Regarding the shift to online learning, President Brown stated, "[o]ur hope is that our virtual technology will allow us to stay connected as we study and interact remotely, but *I know it will not be the same*" (emphasis added).[3]

3.    Faculty had approximately one week following the last in-person classes to prepare these "replacement" courses.

4.    Plaintiff understands that the disbanding of university life was a consequence of the global pandemic. Social distancing, shelter-in-place orders, and efforts to "flatten the curve" prompted colleges and universities across the country to shut down their campuses, evict students from campus residence halls, and switch to online "distance" learning. BU has further responded with cost-cutting measures, including:

a.    Freezing staff hiring through fiscal year 2021;[4]

b.    Freezing faculty and staff salaries through fiscal year 2021;[5]

c.    Cutting the salaries of the president, the provost and chief academic officer, deans, and vice presidents;[6] and

d.    Laying off 1,636 part-time student employees.[7]

---

[1] https://www.bu.edu/president/message-from-president-brown-covid-19-update/
[2] *Id.*
[3] *Id.*
[4] *See* https://www.bu.edu/articles/2020/brown-outlines-how-bu-aims-to-cover-shortfall
[5] *See id.*
[6] *See id.*
[7] *See*    https://www.masslive.com/coronavirus/2020/04/coronavirus-boston-university-lays-off-1600-amid-pandemic.html

5.      Students, meanwhile, have not had their costs cut during the pandemic. On the contrary, the University continued to charge students full tuition and fees—even as students suffered from the pandemic, the loss of housing, on-campus jobs and internships, and the full academic and extra-curricular on-campus college experience (much of which was to be funded by mandatory fees the University has not returned) for which they contracted with BU. On April 3, 2020, BU Provost Jean Morrison announced that "[s]ince classes are continuing for the remainder of the semester via remote instruction, there will be no credits to student accounts related to spring 2020 tuition charges." Further, in that same April 3, 2020 correspondence, Morrison announced that there "will be no adjustments or account credits for mandatory fees." The referenced fees include, for undergraduates, the Community Service Fee, collected to pay for student organizations, programs, and service, and the Student Services Fee and the Health & Wellness Fee, collected to support student health services, wellness activities, student support services, and technology resources. In addition to these fees, which were charged and paid each semester, Defendant also charged its undergraduate students a $130 Sports Pass annual fee in Fall 2019, which granted students admission to all home events for ice hockey, basketball, lacrosse and soccer. All sports events, however, were canceled as well.

6.      In response to BU's refusal to issue adequate refunds to students whose educational experience, access and services were interrupted by the school's closure and move to online instruction, over 2,150 people have signed an online petition at www.change.org. Specifically, the organizing students explain that they and their peers "accept the high cost of attendance to make use of [BU's] world-class facilities and receive [BU's] uniquely-prestigious and comprehensive educational experience in the heart of Boston," but that this access has been "diminished by the move to an online format."

7.      While students enrolled and paid for a comprehensive educational experience, Defendant instead provided something far less: a limited online experience presented by Google or Zoom, void of face-to-face faculty and peer interaction, separated from program resources and barred from facilities vital to study. Students have been deprived of the opportunity for collaborative learning and in-person dialogue, feedback, and critique. Plaintiff and the Class did not bargain for such an experience.

8.      The online courses that the University now provides as a replacement are neither the same service as in-person courses and educational experiences, nor are they of equivalent value. And, BU does not recognize them as equivalent. Research studies also reflect the lesser value of online instruction. Among other consequences, students enrolled in online college courses receive lower grades not only in those courses, but in courses during subsequent semesters as well. Students at the University also rely on in-person discussion sessions and tutoring, among other things, to which they no longer have the same access.

9.      Scott Galloway, who teaches marketing at NYU Stern School of Business, concedes:[8]

> At universities, we're having constant meetings, and we've all adopted this narrative of "This is unprecedented, and we're in this together," which is Latin for "We're not lowering our prices, b*****s." Universities are still in a period of consensual hallucination with each saying, "We're going to maintain these prices for what has become, overnight, a dramatically less compelling product offering."

10.     BU is among the institutions engaged in this "hallucination."

---

[8] James D. Walsh, "The Coming Disruption," New York Magazine, May 11, 2020, available at https://nymag.com/intelligencer/2020/05/scott-galloway-future-of-college.html (site last visited July 1, 2020).

11.     BU has refused to provide reimbursement for the tuition, housing, fees, and other costs for in-person courses and campus access, services, and activities that it is no longer providing, such that Plaintiff and the Class have been financially damaged.  Both contract and equity demand that Defendant disgorge its ill-gotten funds.

12.     Plaintiff brings this action because Plaintiff and the Class did not receive the full value of the access, programs, and services for which they paid, including the benefits of in-person instruction and the on-campus experience. They have lost the benefit of their bargain and/or suffered out-of-pocket losses while Defendant retains the complete sums of Plaintiff's and the Class's payments. They are entitled to recover compensatory damages, and attorneys' fees and costs. Accordingly, Plaintiff brings this action to recover payments for access, programs, and services for which the University was paid, but failed to deliver.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

14.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because Defendant resides in this District and a substantial part of the acts or omissions giving rise to this Complaint occurred in this District.

## PARTIES

*Plaintiff*

16.     Plaintiff has, at all relevant times, been a student at Boston University and resident of California.

17.     Plaintiff is an undergraduate majoring in neuroscience and philosophy who has made all tuition and fee payments charged to her by the University for the Spring 2020 semester.

18.     At all relevant times, Plaintiff has been in good financial standing at BU, having paid all required tuition and fees.

19.     Plaintiff enrolled at Boston University to obtain the full experience of live, in-person courses and direct interactions with instructors and students. While BU offers some online programs, Plaintiff purposefully did not apply to those programs.

20.     The tuition and fees for which BU charged Plaintiff were predicated on access to and constant interaction with and feedback from peers, mentors, professors, and guest lecturers; access to technology, libraries, and laboratories; opportunities to attend or participate in spectator sports and athletic programs; access to student government and health services; and participation in extracurricular groups and learning, among other things.

21.     For example, Plaintiff's Spring 2020 semester class in neuroscience originally offered, *inter alia*, support in the form of discussion sessions and tutoring. This support changed when the class was moved from in-person to online.

22.     In another example, Plaintiff's Spring 2020 semester class in philosophy offered, *inter alia*, discussion sessions on which Plaintiff relied. In Plaintiff's experience, the quality of these discussion sessions has diminished significantly since the class was moved from in-person to online.

23.     In yet another example, Plaintiff was registered for a class in sailing in the Spring 2020 semester. The opportunity to take this class, which is open only to juniors and seniors, was a factor in Plaintiff's choice of BU over other undergraduate institutions. The class is now canceled.

*Defendant*

24.     Founded in 1839, Boston University is the fourth largest private, not-for-profit, residential research university in the United States, with over 35,000 students across over 300 programs of study. The Trustees of Boston University (incorporated by an act of the Legislature of the Commonwealth of Massachusetts for the establishment and oversight of Boston University) is the governing body of BU. It provides oversight of and has fiduciary responsibility for BU's academic, financial, and business affairs.

## FACTUAL ALLEGATIONS

**Boston University's Finances**

25.     As of June 30, 2019, BU's endowment totaled over $2.3 billion and the University ended the fiscal year with assets totaling more than $7 billion.[9] A sizable portion of BU's assets come from the tuition and fees that its students pay. For the 2019-2020 academic year, the annual BU undergraduate tuition was $54,720,[10] exclusive of fees. The University collected $1.164 billion in net student tuition and fees—a $64.5 million increase from the year before—with Defendant's total operating revenues totaling $2.17 billion.[11] Moreover, Defendant reported a $215.2 million positive change in net assets, with total operating revenues exceeding total operating expenses by over $158 million.[12]

---

[9] *See* https://www.bu.edu/cfo/files/2019/09/Boston-University-Audited-Financial-Statements-6-30-19.pdf
[10] *See* https://www.bu.edu/reg/registration/tuition-fees
[11]   https://www.bu.edu/cfo/files/2019/09/Boston-University-Audited-Financial-Statements-6-30-19.pdf.
[12] *Id.*

26.     BU's first-ever fundraising campaign also concluded in September 2019, with Defendant reporting having raised a total of $1.85 billion in support that established more than 267 endowed scholarship funds, 57 endowed full professorships, and numerous gifts for the major funding of campus capital projects over the past several years.[13]

**Boston University's Marketing**

27.     Many schools nationwide offer and highlight remote learning capabilities as a primary component of their efforts to deliver educational value, such as Western Governors University, Southern New Hampshire University, University of Phoenix-Arizona, and myriad public institutions. BU is not such a school.

28.     Rather, a significant focus of Defendant's efforts to obtain and recruit students pertains to the campus experience it offers, along with face-to-face, personal interaction with skilled and renowned faculty and staff. Through its website and other literature, the University sells on-campus instruction, the on-campus experience, and the City of Boston as key reasons that a student should choose to attend BU. This is true across BU's schools, the degrees it offers, and its disciplines.

29.     BU recognizes that its website promises a particular service and educational experience. In the March 2020 version of the "Why BU?" portion of its website, the University wrote: "SEE YOURSELF AT BOSTON UNIVERSITY," continuing, "[t]he best way to know if BU is the place for you is to visit. Take a walk down Comm Ave and feel for yourself the energy buzzing up and down our urban, dynamic campus. It's all here, waiting for you!"[14]

---

[13] *See* http://www.bu.edu/articles/2019/campaign-for-boston-university-faq/.

[14] https://web.archive.org/web/20200331015445/http://www.bu.edu/admissions/.

30.     By mid-April 2020, that text had changed, but still emphasizes the on-campus experience. It now reads: "SEE YOURSELF AT BOSTON UNIVERSITY," and then says, "[a]s you embark on your college search, we want to assist you by offering a glimpse into **life at** Boston University with a variety of virtual events and programming. Begin your journey to BU with a personalized look into **life on campus**, and hear directly from admissions officers and current students about why BU could be the right fit for you"[15] (emphases added).

### *Academics*

31.     Each of BU's schools and the University's university-wide offerings market in-person, on campus benefits.

32.     The BU Hub, for undergraduates, "is Boston University's University-wide general education program that emphasizes working across disciplines to prepare for a complex and diverse world."[16] Of the Hub's "cocurricular learning experiences," the University says:

> For many BU students, experiential learning can be as important to their education as coursework [BU recognizes] the value and impact of learning that happens outside of classroom settings by offering students opportunities to participate in cocurricular experiences that combine activities, assignments, and reflection.[17]

33.     Undergraduates also have the opportunity to participate in a "cross-college challenge," in which "[s]tudent teams work with their faculty as well as with a variety of on-campus and community partners on a substantial, research-based challenge."[18]

34.     BU also promotes the school's "perfect class size" in admissions materials: "For a University of more than 16,000 undergraduates, BU has a surprisingly small student-to-faculty

---

[15] https://www.bu.edu/admissions/.
[16] https://www.bu.edu/hub/more-hub-experiences/cocurricular-learning-experiences/.
[17] *Id.*
[18] https://www.bu.edu/hub/cross-college-challenge-xcc/.

ratio–10:1. With an average class size of 27, you'll not only meet award-winning professors, you'll engage with them."[19]

35.    In BU's "state-of-the-art Engineering Product Innovation Center or Imagineering Laboratory, [students] can develop innovative products using computer-aided design tools and cutting-edge 3-D printers."[20]

36.    Advertising Wheelock, its College of Education, the University says:

> Continuous involvement in the surrounding community has made Wheelock's faculty and students particularly effective teachers and learners who are sensitive and responsive to the circumstances and realities of schooling.[21]

37.    Further, BU emphasizes of Wheelock:

> Undergraduate students have opportunities to explore career options and relate theory to practice. At all degree levels, students are encouraged to work with faculty and research associates in building bridges among the academic, service, and research functions of the College. Wheelock draws heavily on the educational community of the Boston metropolitan area, educational partners in selected international sites, and the special skills of faculty and research associates working in centers, clinics, and laboratories in the College, the University, and in community agencies and hospitals.

> Opportunities for overseas and regional field assignments are complemented by opportunities to work locally with faculty and graduate students in school-based clinics and learning laboratories. Collaborative arrangements with human service agencies and corporations allow students to match the training, development, and evaluation skills of the educator with the unique needs of those environments.

> Urban and suburban fieldwork and service opportunities for students are also abundant. Through a cooperative network of school districts (including Boston, Brookline, Chelsea, Concord, Lexington, Newton, Quincy, Somerville, and others) and carefully structured

---

[19] https://www.bu.edu/admissions/why-bu/facts-and-rankings/10-reasons/.
[20] https://www.bu.edu/admissions/why-bu/academics/schools-and-colleges/.
[21] https://www.bu.edu/academics/wheelock/.

experiences overseas, students can link theory with practice and work with professionals in helping children and adults.[22]

38.    BU's College of Fine Arts (CFA) "offers professional training in the arts in conservatory-style environments."[23] "Emphasis" says the University, "is placed on studio instruction: the focus of the student's acquisition of professional skills and techniques through personalized instruction and mentoring."[24]

39.    "Each and every day," BU continues, "CFA students fill pages and canvases, stages and galleries, and recital and concert halls with their extraordinary creations and innovations." Indeed, as part of this marketing, BU promises that a CFA education "extends beyond the walls of the practice rooms and studios," telling potential students, "[y]ou'll also benefit from the rich centers of art and culture throughout the city of Boston, [and] international opportunities through the study abroad program . . . ."

40.    In the College of General Studies, the University highlights, "[s]tudents apply their interdisciplinary education to real-world problems through experiential assignments and the Capstone project at the end of the second year."[25]

41.    BU's Sargent College of Health & Rehabilitation Sciences is, according to BU's website, "one of the country's leading schools of health and rehabilitation sciences, [and] combines outstanding faculty, challenging academic curricula, and state-of-the-art facilities to provide rigorous education and exemplary clinical experiences."[26] "Sargent," says BU, "offers a close-

---

[22] *Id.*
[23] https://www.bu.edu/cfa/aboutcfa/.
[24] https://www.bu.edu/academics/cfa/.
[25] https://www.bu.edu/academics/cgs/.
[26] https://www.bu.edu/sargent/about-us/welcome-from-dean-chris-moore/.

knit, small-college environment in a large, diverse, research university. Professors are supportive and accessible, and have a genuine connection to their students."[27]

42.    BU also underscores that "[f]ieldwork is an important component in all programs at Sargent College. To provide students with clinical experience, the college partners with hospitals, rehabilitation centers, schools, community health agencies, and research laboratories in the Boston area and throughout the United States."[28] "Our students," says BU, "gain research experience in faculty labs, at Boston Medical Center and numerous Boston-area hospitals, and through their participation in our Undergraduate Research Opportunities Program (UROP)."[29]

43.    Moreover, Sargent has "more than 1,100 clinical sites throughout the U.S. and abroad; Sargent students develop extraordinarily broad skills in a diverse range of real-world, interdisciplinary settings. These training experiences are enhanced by the leadership and deep involvement of Sargent students and faculty in interdisciplinary research at more than 30 clinical education centers, research labs, and research centers."[30]

44.    The location of the University's Graduate Medical Science (GMS) program also is a key selling point in BU's literature:

> GMS is located in the historic South End of Boston in the hub of a modern urban academic health center, Boston University Medical Campus (BUMC), which includes Boston University School of Medicine, the BU School of Public Health, and Boston University's Henry M. Goldman School of Dental Medicine. Also on campus is Boston Medical Center, one of Boston's leading teaching hospitals and the primary teaching affiliate of BUSM. Together, these institutions boast a world-class faculty with many established collaborations between clinical and basic science investigators. This provides a unique opportunity for students to participate in translational and cross-disciplinary research using state-of-the-art

---

[27] Id.
[28] https://www.bu.edu/academics/sar/.
[29] http://www.bu.edu/sargent/about-us/welcome-from-dean-chris-moore/.
[30] Id.

core facilities (e.g., imaging, flow cytometry, proteomics, and gene expression analysis).[31]

45.    At the School of Social Work (SSW), BU's "mission is to develop dynamic and diverse social work practitioners, leaders, and scholars through rigorous teaching, innovative research, and transformative community engagement."[32] Although "[t]he classroom is a critical component of an SSW education," so "is having the opportunity to apply your knowledge in a social work setting, which takes learning to an even more dynamic level. An integral and required part of the SSW experience, the field education internship is a course that offers students practice experience with individuals, families, groups, communities, and organizations. Internships take place in many settings where social workers practice . . . Placements and practice courses take place concurrently, integrating classroom and field learning. Students typically spend two or three days a week at their internships."[33]

46.    The School of Law promises that students "will learn practical legal skills in a wide range of civil and criminal law clinics, national and international externships, and pro bono placements, in addition to learning legal theory in class."[34] And in the School of Medicine, "[s]tudents enjoy . . . the benefits of study in an urban academic medical center with diverse settings for clinical instruction and externships in affiliated hospitals and community health centers."[35]

---

[31] https://www.bu.edu/academics/gms/.
[32] https://www.bu.edu/academics/ssw/.
[33] https://www.bu.edu/ssw/academics/field/.
[34] https://www.bu.edu/academics/law/.
[35] https://www.bu.edu/academics/busm/.

*On-Campus Activities*

47.     According to BU, the benefits of its on-campus, in-person educational service do

not stop with its academic offerings. Says the "Student Life" portion of BU's website:

> University living begins with academics, but it doesn't end there. At
> Boston University, the list of social, athletic, artistic, and other types
> of clubs is more than 500 lines long, and runs from Accounting to
> Zen. There are literary clubs, classic rock clubs, real rock—as in
> geology—clubs, and intramural and club sports for almost every
> participatory sport one can imagine. The most popular? That would
> be Broomball, a game played on a hockey rink, but without the
> benefit of ice skates.[36]

48.     The University touts its "450+ Student Groups," promising students:

> You'll do so much more than just study here . . . play in a BU band,
> join a Broomball team, attend a BU Hockey game, get involved in
> Greek life, run for BU Student Government, have coffee and
> conversation at the Howard Thurman Center for Common Ground,
> attend a Dear Abbeys a cappella show, chow down at Lobster
> Night—and you'll feel your Terrier pride in no time.[37]

49.     The University also emphasizes its "Campus Resources and Services" and "Hands-

On Learning," asking:

> What's it like to be a BU student? Well, no two students share the
> same experience, but at the core of BU's spirit is a love for all things
> intellectual, dynamic, and stimulating. Undergraduates have "game
> day" enthusiasm for everything from a poetry slam to the Redstone
> Film Festival to community service. Then, of course, there are our
> spirited athletics programs.[38]

*Housing*

50.     BU promotes its on-campus housing as another key part of its educational service

and experience. "First-year [undergraduate] students are required to live on campus to get the most

---

[36] https://www.bu.edu/campus-life/students/.

[37] https://www.bu.edu/admissions/why-bu/facts-and-rankings/10-reasons/.

[38] https://www.bu.edu/admissions/why-bu/student-life/.

out of their BU experience, which means you'll have one of the world's most diverse, historic cities right in your backyard."[39]

51.     Again emphasizing its "experiential learning" and "discovery beyond the classroom," BU advertises its "Living-Learning Communities, such as the Core Curriculum House, Earth House, or Women in Science and Engineering (WISE) floor, [which] promote students' intellectual development and foster community learning."[40]

52.     Moreover, in the "Faculty-in-Residence program . . . [faculty] live alongside [students] in residence halls across campus, serving as role models, resources, and advocates for [them]. These faculty members help students develop interests through collaborative, innovative, and fun activities ranging from viewing parties to preparing and testing meals that may be introduced into the dining halls."[41]

53.     And, "[y]ou don't have to wait until classes to jump in," BU tells incoming freshman. "Our First-Year Student Outreach Project (FYSOP) lets you move in a week early to participate in a service project. You can choose from 11 different issue areas, from children to human rights to the environment. You'll work with more than 800 new students and 150 upperclass staff leaders—a great way to get to know your classmates from day one."[42]

### *Location in Boston*

54.     Throughout BU's advertising is its emphasis on its geographical location, as emblazoned in all capitalized letters on the admissions page: "LOCATED IN THE HEART OF BOSTON."[43]

---

[39] https://www.bu.edu/admissions/why-bu/student-life/housing/.
[40] *Id.*
[41] *Id.*
[42] https://www.bu.edu/admissions/why-bu/student-life/student-activities/.
[43] https://www.bu.edu/admissions/.

55. BU instructs prospective students to "[p]icture [themselves] at Boston University with our interactive and comprehensive online campus tour. See inside campus buildings and hear about the unique opportunities available to students directly from staff and BU students themselves, with a 'virtual tour.'"[44]

56. Visitors to BU's "Why BU" site are directed to a 3 minute and 40 second video describing Boston as "basically an extension of [BU's] campus."[45]

57. "[J]ust outside our doors lies the exciting, intellectually stimulating city of Boston—a major center for medicine, higher education, research, and technology,"[46] says the Sargent website.

58. Notes the College of Communication: "Boston not only is the nation's birthplace of higher education, but it remains a center of creativity, of learning, of intellectual energy and, last but not least, of fun."[47]

59. The School of Hospitality notes the critical role the city of Boston plays in its educational offerings, saying: "The School of Hospitality Administration has developed a unique relationship with the city of Boston and employers who make up the industry. The area's many hotels and restaurants provide students with numerous opportunities for internships to satisfy the work experience requirements of their hospitality degree, including an international experience."[48]

60. The School of Law promises students: "You will also have access to all the resources a major city has to offer—federal and state courts, the Massachusetts legislature,

---

[44] https://www.bu.edu/admissions/why-bu/student-life/boston/.
[45] *Id.*
[46] https://www.bu.edu/sargent/about-us/welcome-from-dean-chris-moore/.
[47] https://www.bu.edu/academics/com/.
[48] https://www.bu.edu/academics/sha/.

nongovernmental organizations, corporations, law firms of all sizes, cultural and historical offerings, major sporting events, and many other civic and social opportunities."[49]

61.    And, the School of Medicine highlights its location "in Boston's historic South End, adjacent to its principal teaching hospital Boston Medical Center, on the Boston University Medical Campus, which also includes the schools of Dental Medicine and Public Health, the Solomon Carter Fuller Mental Health Center, and BioSquare, the University's 16-acre biotechnology research park."[50]

62.    The Student Life portion of BU's website sells its "8 'T' stops on campus, to take you anywhere in Boston," encouraging students, when considering what it's "like to be a BU student," to "[a]dd the city of Boston, and you have a buzzing campus filled with bright, ambitious, energetic students."[51]

63.    BU also touts its community service opportunities, telling prospective students that it "sponsors dozens of community service programs with the city of Boston each year," including the opportunities to "Be a Big Sibling to a kid who needs a hero," "Tutor a recent immigrant in English," "Help out with HIV/AIDS education programs," and "Help plant an urban garden."

**BU Offers Distinct Online and In-Person Programs**

64.    Upon information and belief, BU's website and recruitment brochures are the primary means through which it targets prospective students and persuades them to apply for admission to and subsequent enrollment at Boston University, as opposed to any other institution of higher learning.

---

[49] https://www.bu.edu/academics/law/.
[50] https://www.bu.edu/academics/busm/.
[51] https://www.bu.edu/admissions/why-bu/student-life/.

65.    Defendant markets two distinct services to prospective students. One service is certain classes and degree programs that are offered on a fully online basis. BU dedicates an entire section of its website to these programs: "Boston University's Online Degree and Certificate Programs."[52]

66.    Defendant offers an Online Education Course Tour, featuring a 3 minute and 27 second video on what a BU online program offers.[53]

67.    Defendant specifically refers to the online program as the "online experience." Defendant specifically refers to in-person enrollment as the "college experience." Defendant clearly distinguishes between the two services. Defendant also has separate Frequently Asked Questions pages, one for "Online Learning"[54] and one for "BU Admissions."[55]

68.    Prospective students who have been admitted to BU's in-person programs also are invited to attend an admitted student's day, hosted on Defendant's campus, where Defendant again markets its services and the desirability of enrollment at BU by highlighting the University's location and the many benefits of being on its campus.

69.    Prospective students are again given a tour of campus and have the opportunity to hear from faculty and current students about all the benefits of BU's location.

70.    Once undergraduate students accept their admission offers, they are asked to review the "next steps checklist," which includes "attend an Open House program on campus," "submit your New Student Housing Application," "order your extra-long sheets and other dorm essentials,"

---

[52] *See* https://www.bu.edu/online/programs/.
[53] *See* https://www.bu.edu/online/online-learning/tour/.
[54] *See* https://www.bu.edu/online/online-learning/faq/.
[55] *See* https://www.bu.edu/admissions/apply/faqs-helpful-forms/faqs/.

"take the T to explore the city of Boston," and "contact your future roommate." All of the "steps" presume in-person attendance at the University.

71.    Accepted students also are required to attend an orientation session, which is specific to the school or college they will attend.[56]

72.    New student orientation takes place on campus and involves multiple sessions extolling the value of the on-campus student experience.

73.    The class registration process also reflects the specific distinction Defendant draws between its in-person and online class offerings. When students log on to "WebReg" through their "Student Link"[57] account, they can register for in-person classes. Each class is listed by description, meeting time, and physical classroom location.

74.    As viewable in WebReg, different payment deadlines to settle accounts and finalize schedules for the upcoming semester apply to "Classroom" students versus "Online" students.

75.    Students in many of the on-campus schools and programs are subject to strict personal attendance requirements, as set forth in various departmental policies and handbooks. Defendant requires, and students accept, that students in the on-campus schools *must* physically attend their classes on campus.

**The Cost of Attending BU**

76.    BU is among the nation's most expensive private secondary educations. It estimates that for the 2020-2021 academic year, the total cost of undergraduate attendance will be $77,662.00,[58] an amount which exceeds the median household income in the United States for

---

[56] https://www.bu.edu/orientation2020/what-to-expect/.

[57] Student Link is the portal through which students access general and personal academic, financial, and institutional data maintained in the University's central computer system.

[58] https://www.bu.edu/admissions/tuition-aid/tuition/.

2018, and nearly meets the median household income in the United States for 2019. The University justifies its high costs by touting the vitality of its "world-class, well-rounded" educational experience, programs, access to facilities, and services.

77.    For the Spring 2020 semester, undergraduates were charged $27,360.00 in tuition, or, if they attended part-time, $1,710 per credit.[59] They also paid a $60.00 Community Service Fee, $307.00 Student Services Fee, a $219.00 Health & Wellness Fee, and at the beginning of the 2019-2020 academic year, an annual Sports Pass Fee of $130.00, granting admission to many home sporting events.[60]

78.    BU explains the intended purpose of the $60 Community Service Fee as follows:

> Under the direction of the Dean of Students, 100% of revenue collected through this fee is allocated directly to support student programs, which foster and engage the community. The Student Allocations Board, Programming Council and Residence Hall Associations/Student Government distribute the majority of these funds to approximately 500 student groups and organizations. Any student program funds not used by the end of a current fiscal year may be carried over to the subsequent year with the approval of the Dean of Students.[61]

79.    These organizations, programs, and services either ceased operation when BU closed its campus or were dramatically curtailed.

80.    BU explains the intended purpose of the $307 Student Services Fee as follows:

> Proceeds from this mandatory fee are allocated to support student service operations and technology resources across campus including, but not limited to, services at the George Sherman Union,

---

[59] https://www.bu.edu/reg/registration/tuition-fees/.

[60] *Id.*

[61] This was Defendant's description of the Community Service Fee as of January 2020. Since the announcement of campus closure, Defendant has changed the description of the Community Service Fee to explicitly reference "both online and in-person programs." *See* https://www.bu.edu/studentaccountingservices/your-bill/tuition-fees/.

East Campus Student Service Center, Residence Halls and other such student support spaces as well as campus network services.[62]

81.     BU describes the intended purpose of the "Health & Wellness Fee" as follows:

Proceeds from this mandatory fee help offset the cost of student Health Services clinic at 881 Commonwealth Avenue as well as the Fitness & Recreation Center and their satellite operations. Wellness & prevention services promote physical and emotional well-being among students through comprehensive programming, peer health support, connection to resources, sharing accurate and relevant health information, and providing consultation and care for students struggling with substance misuse. Holistic services provided minimize the risk of illness, injury, and harm all while establishing a foundation for students to optimize their capacity to learn, reach their potential, and achieve their goals both inside and outside of the classroom.[63]

82.     The Student Services and Health and Wellness services and activities have been dramatically curtailed since BU shut campus down and sent students home.

83.     Further, when BU closed its campus, it closed the Fitness & Recreation Center, and in any event, by sending home its student population, it cut students off from receiving any access and services funded by these fees.

84.     Tuition for the University's graduate programs differs based on degree and course of study. By way of example, the Spring 2020 tuition for the School of Law was $27,850;[64] for the School of Social Work, $17,568.[65]

---

[62] This was Defendant's description of the Student Services Fee as of January 2020. Since the announcement of campus closure, Defendant has changed its description of the Student Services Fee to omit direct references to on-campus facilities and network services. *See* https://www.bu.edu/studentaccountingservices/your-bill/tuition-fees/.

[63] This was Defendant's description of the Health & Wellness Fee as of January 2020. The description of the fee was subsequently updated as of July 23, 2020 to include "Telehealth visits and online wellness and prevention programming" as well as "to offset the expenses of COVID-19 testing for students…." *See* http://www.bu.edu/studentaccountingservices/your-bill/tuition-fees/.

[64] https://www.bu.edu/reg/registration/tuition-fees/.

[65] *Id.*

85.     Fees paid by or on behalf of BU students vary based on program of study. By way of example, undergraduate students pay fees of approximately $609 per semester while law students pay $656 per semester, and graduate students in the medical sciences program pay $378 per semester. Many students are required to pay additional fees associated with specific in-person courses (*e.g.*, laboratory courses or visual arts courses).

**BU Changes its Educational Offerings**

86.     BU's spring term began with the first day of classes on or about January 21, 2020.

87.     Students contracting to live on-campus were permitted to move into their on-campus residences as of January 17, 2020.

88.     BU's spring term was scheduled to conclude with the last day of examinations on or about May 9, 2020, with a residence hall check-out deadline of May 10, 2020.

89.     BU's spring break began on or about March 7, 2020 and was supposed to end on or about March 15, 2020, with students returning to campus to resume in-person classes on Monday, March 16, 2020.

90.     However, on or about March 11, 2020, Defendant informed students, including Plaintiff, that classes would transition to online-only classes for at least a month, from March 16 through April 13, 2020, and that BU would attempt to provide instruction electronically via online classes until at least April 13.

91.     A week later, on March 17, 2020, President Brown informed students that the remainder of the semester would be limited to online only and that students would be requested to vacate campus residential facilities, as noted in correspondence to students titled "Message from President Brown, COVID-19 Update."[66]

---

[66] https://www.bu.edu/president/message-from-president-brown-covid-19-update/.

92. The University's own communications reflect its awareness that the online service it was substituting for the in-person service for which Plaintiff paid was not of equal value. University President Robert Brown stressed the importance of the in-person educational experience: "Discontinuing in-person instruction is a difficult decision, as it interrupts an essential element of our learning community, the interactions that occur in our classrooms, laboratories, and studios. We recognize that this will cause significant disappointment to many students, faculty, and staff."[67] By his own admission, "online delivery is not a substitute for living and learning in our academic community."[68] He stated, "[o]ur hope is that our virtual technology will allow us to stay connected as we study and interact remotely, but I know it will not be the same."[69]

93. A report from the Brookings Institution[70] comparing online and in-person learning in higher education found that:

a. Students taking a course in-person averaged roughly a B-, whereas students taking that course online averaged roughly a C;[71]

b. Taking a course online reduces a student's overall GPA the following term by 0.15 points;[72]

c. Taking a course online reduces a student's GPA the following term for courses in the same subject area by 0.42 points;[73]

---

[67] https://www.bu.edu/president/letter-to-the-community-on-coronavirus-followup/.
[68] https://www.bu.edu/president/message-from-president-brown-covid-19-update/.
[69] https://www.bu.edu/articles/2020/remote-classes-through-spring-semester/.
[70] *See* Eric Bettinger & Susanna Loeb, *Promises and Pitfalls of Online Education*, Economic Studies at Brookings, Evidence Speaks Reports, Vol. 2, #15 (June 9, 2017), https://www.brookings.edu/wp-content/uploads/2017/06/ccf_20170609_loeb_evidence_speaks1.pdf (the "Brookings Report").
[71] *See* Brookings Report at 3.
[72] *Id.*
[73] *Id.*

    d.   Taking a course online reduces a student's GPA the following term for courses for which the online course is a prerequisite by 0.32 points;[74] and

    e.   Taking a course online, as opposed to in person, reduces the likelihood of a student remaining enrolled by roughly 9 percent.[75]

94.    In addition, a 2015 Stanford Center for Education Policy Analysis Working Paper[76] found that:

    a.   Students in an online course are 8.4 percent less likely to pass the course than are students taking the course in person;[77] and

    b.   Students in an online course are 12.3 percent less likely to receive an A minus or above than are students taking the course in person.[78]

95.    The Stanford Paper concludes that its analysis "provide[s] evidence that students in online courses perform substantially worse than students in traditional in-person courses, and these findings are robust across a number of specifications."[79]

96.    Faculty, academic leaders, employers, and the public remain skeptical about the value of online education.[80] A Gallup poll in 2013 found that "Americans' overall assessment of

---

[74] *Id.*

[75] *Id.*

[76] *See* Eric Bettinger, Lindsay Fox, Susanna Loeb & Eric Taylor, *Changing Distributions: How Online College Classes Alter Student and Professor Performance*, CEPA Working Paper No. 15-10 (October 2015), https://files.eric.ed.gov/fulltext/ED580370.pdf (the "Stanford Paper").

[77] *See* Stanford Paper at 16.

[78] *Id.*

[79] *Id.* at 18.

[80] *See* I. Elaine Allen, *et al.*, *Online Report Card: Tracking Online Education in the United States*, Babson Survey Research Group & Quahog Research Group, LLC 9 (Feb. 2016) ("Allen 2016 Survey"), available at https://onlinelearningsurvey.com/reports/onlinereportcard.pdf.

internet-based college programs is tepid at best." The majority of Americans found internet-based college programs to be "only fair" or "poor."[81]

97.    In ten national surveys of chief academic officers by the Babson Survey Research Group during the 2002-2015 period, no more than a third reported that their faculty "accept the value and legitimacy of online education."[82] In a 2012 survey of over 4,500 faculty, two-thirds reported that learning outcomes for online courses are "inferior or somewhat inferior" when compared to face-to-face courses, with only 6 percent reporting outcomes for online instruction as "superior or somewhat superior."[83]

98.    The Chronicle of Higher Education also has found that online colleges ranked last in terms of "employer desirability of college type"; indeed, online programs were the only type of college found to be undesirable.[84] And a 2013 study found that over half of employers prefer "a job applicant with a traditional degree from an average school over an applicant with an online degree from a top university (just 17 percent say they'd prefer the latter)."[85] Thus, students who receive entirely online instruction will have "limited labor market opportunities as long as these strong views persist among employers."[86]

---

[81] Lydia Saad, *et al.*, In U.S. Online Education Rates Best for Value and Opinions; Viewed as Weakest in Terms of Trusted Grading and Acceptance by Employers, Gallup (Oct. 15, 2013) ("Saad Gallup Poll"), available at https://news.gallup.com/poll/165425/online-education-rated-best-value-options.apx.

[82] Allen 2016 Survey at 6.

[83] I. Elaine Allen, *et al.*, *Conflicted: Faculty and Online Education, 2012*, Babson Survey Research Group & *Inside Higher Ed* (Feb. 2012) ("Allen 2012 Survey"), available at https://files.eric.ed.gov/fulltext/ED535214.pdf.

[84] The Role of Higher Education in Career Development: Employer Perceptions, Chronicle of Higher Education (Dec. 2012), available at https://chronicle-assets.s3.amazonaws.com/5/items/biz/pdf/Employers%20Survey.pdf.

[85] Public Agenda, *Not Yet Sold: What Employers and Community College Students Think About Online Education* (Sept. 13, 2013), available at https://www.publicagenda.org/reports/not-yet-sold-what-employers-and-community-college-students-think-about-online-education/.

[86] *Id.*

99.     Prior to the Spring 2020 semester, Defendant did not offer a full-time online undergraduate option. Instead, Defendant administered only an undergraduate degree completion program and limited number of online graduate and certificate programs online. These virtual programs were designed, from their inception, to be taught and delivered online. Specifically, they were "designed via a unique collaboration between Boston University's Distance Education office"—which "consists of a team of instructional designers, media producers, and support staff who specialize in online education"—and faculty members across BU. By offering such limited courses and programs online, and ensuring that those offerings were crafted by those with expertise in online education, Defendant acknowledged that virtual education is a unique format and, moreover, that Defendant was not prepared to deliver the hundreds of programs and degrees it offers on-campus in a virtual format.[87]

100.     Defendant recognized this fact in a March 9, 2020 communication to BU faculty. "If the University were required to close or otherwise cease all in-person meetings, it is our expectation that faculty will find the best approach to continue offering course content," BU Provost and Chief Academic Officer, Dr. Jean Morrison, wrote. Morrison also recognized that this might be some faculty members' "first experience" with online teaching technologies like Zoom and Blackboard, and advised that faculty "participate in a training at their earliest convenience." In other words, just days before announcing a universal and forced shift to online instruction, Defendant acknowledged that many professors would be utilizing online teaching technologies for the very first time, and merely directed them to build the tools and competencies necessary to do so successfully at their "convenience."

---

[87] https://www.bu.edu/online/programs/.

101.    BU's post-COVID-19 online student offerings do not even come close to comparing with either BU's in-person course experiences or BU's course offerings that, from the outset, have been designed specifically for virtual delivery, by faculty with experience and expertise in online instruction.

102.    Upon information and belief, some professors are simply uploading pre-recorded videos that offer no student/teacher interaction, and in some instances, professors are simply posting assignments online with no video at all. Additionally, many online lectures are now significantly shorter than the scheduled class time allotment.

103.    For example, one BU student, Jasmine Gordon, recently shared her experience—and frustration—with online learning: "I think face to face interaction is far more valuable than anything else at BU. I know myself and a few other students who are watching. We're not going to Zoom every day. We aren't talking to our professors every day. We get into the emails and we're watching old, pre-recorded lectures."[88]

104.    The remote, online learning "classes" offered to Spring 2020 students from March forward deprive students of in-person learning from their peers and school faculty. The move to these remote classes also deprived students of access to the facilities, materials, and opportunities only offered on BU's physical (as opposed to virtual) campus, including laboratory and research experience, use of on-campus facilities, use of on-campus services, and attendance at on-campus events.

---

[88]    *See*    https://dailyfreepress.com/2020/04/04/students-to-receive-partial-refunds-for-spring-semester/.

105.    Even professors agree students have suffered a loss with the transition to online classes. As a professor from another university commented, ". . . [students] had already rejected online education when they chose a traditional campus experience."[89]

106.    BU itself does not recognize its in-person and online educational services as equivalent in value. By way of example, for the Spring 2020 semester, undergraduate in-person education cost $1,710 per credit.[90] Online undergraduate instruction, cost $480 per credit—*i.e.*, $1,230 less per credit for an undergraduate course when it is offered online.[91]

107.    In any event, even if the value were the same, Plaintiff and the Classes did not purchase an online service; they purchased an on-campus, in-person service and did not receive it.

108.    Over 2,150 people have signed an online petition at www.change.org. Specifically, the organizing students explain that they and their peers "accept the high cost of attendance to make use of [BU's] world-class facilities and receive [BU's] uniquely-prestigious and comprehensive educational experience in the heart of Boston," but that this access has been "diminished by the move to an online format." Accordingly, the students believe that they "should be partially refunded for tuition in a way which accurately represents the changes made to the student experience in response to the COVID-19 pandemic." They also request reimbursements for fees and room and board.[92]

---

[89]    *See*    https://www.washingtonpost.com/education/2020/04/04/these-washington-university-faculty-had-rejected-online-classes-until-coronavirus-heres-how-they-made-switch/    (site    last visited August 25, 2020).

[90] *See* https://www.bu.edu/reg/registration/tuition-fees/.

[91]*See*    https://www.bu.edu/online/programs/undergraduate-program/undergraduate-degree-completion-program.

[92]*See*    https://www.change.org/p/boston-university-organize-for-student-sided-partial-tuition-refunds-at-boston-university-the-50-33-plan (last visited May 6, 2020).

**BU Refuses to Issue Refunds**

109.    BU has refused to provide any refund of tuition, not even a partial one.

110.    Rather, on April 3, 2020, BU Provost Jean Morrison announced that "[s]ince classes are continuing for the remainder of the semester via remote instruction, there will be no credits to student accounts related to spring 2020 tuition charges."

111.    The University also has refused to give a prorated refund for fees paid for student services, access, and programs. BU explains: "There will be no adjustments or account credits for mandatory fees. Under the direction of the Dean of Students, funds collected through the Community Service Fee are allocated directly to support student organizations, programs, and services." This is notwithstanding that students cannot use those programs and services because they were curtailed or eliminated, or because students followed the university's instruction to leave the campus and return home.

112.    Although BU has agreed to prorate room and board charges as of March 22, 2020, with respect to housing fees, this fixed date is arbitrary, unfair, and unlawful, resulting in wholly insufficient refunds to students living in on-campus housing.

113.    Students in on-campus housing bargained and paid for housing on the expectation that they would return from spring break on or about March 15, 2020, but they did not receive the benefit of their bargain because they were first encouraged and then required not to return after that date.

114.    In fact, BU instructed students on March 17, 2020 to vacate campus no later than March 22, 2020, but were specifically requested to leave "sooner if possible."[93]

---

[93] https://www.bu.edu/president/message-from-president-brown-covid-19-update/

115.    Plaintiff learned of this instruction while away from campus during spring break and did not return, consistent with BU's instructions.

116.    That Defendant did not "officially" close on-campus housing until March 22, 2020 does not negate the fact that students were deprived of housing prior to that date based on instruction from Defendant and the fact that it was recognized by all parties that it was unsafe for students to return to campus from Spring Break.

117.    Accordingly, the housing refunds being offered by Defendant do not apply to the full cost of housing funds that have been unused as a result of Defendant's response to COVID-19.

118.    BU is profiting from COVID-19 while further burdening students and their families—many of whom have been laid off, become ill, lost loved ones, or are otherwise already bearing the brunt of the COVID-19 pandemic. The result is an enormous windfall to Defendant. Both contract and equity demand that Defendant disgorge its ill-gotten funds.

## CLASS ACTION ALLEGATIONS

### Class Definition

119.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

120.    Plaintiff brings this action on behalf of herself and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, seeks to represent a class (the "Class") defined as:

> All people who paid BU tuition, fees and/or room and board for in-person educational service, programs, access, and room and board that BU failed to provide during the Spring Term, and whose tuition and/or fees have not been refunded (the "Class").

121.    Excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants,

partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, any member of the judge's immediate family, and all counsel of record.

122.    Plaintiff reserves the right to expand, limit, modify, or amend the definitions of the Class as may be desirable or appropriate during the course of this litigation.

123.    This action is brought and may be properly maintained on behalf of the proposed Class under Federal Rule of Civil Procedure 23.

**Numerosity and Ascertainability: Fed. R. Civ. P. 23(a)(1)**

124.    The Class is so numerous and geographically dispersed that joinder of all Class members is impracticable. Upon information and belief, Plaintiff reasonably estimates that there are tens of thousands of members in the Class. Class members may be identified through objective means, such as the University's records, and notified of this action by recognized methods of notice, such as by mail or email, or publication in print or on the internet.

**Commonality and Predominance: Fed. R. Civ. P. 23(a)(2)**

125.    Questions of law and fact that have common answers for the Class predominate over questions affecting only individual Class members. These questions include, without limitation:

  a.  Whether Defendant engaged in the conduct alleged;

  b.  The difference in value between online and in-person educational experiences;

  c.  Whether Defendant has a policy and/or procedure of denying refunds, in whole or in part, to Plaintiff and the Class Members;

d.  Whether Defendant breached identical or substantially the same express or implied contracts with Plaintiff and the Class Members;

e.  Whether Defendant violated the common law of unjust enrichment and/or money had and received;

f.  Whether Defendant converted Plaintiff's and the Class Members' refunds and/or rights to refunds; and

g.  The nature and extent of damages and other remedies to which the conduct of Defendant entitles the Class Members.

### Typicality: Fed. R. Civ. P. 23(a)(3)

126.    Plaintiff's claims are typical of the claims of other Class members and arise from the same course of conduct by Defendant. Plaintiff who were students enrolled at the University for the Spring 2020 term and all Class Members paid the required tuition and fees. Like other student Class Members, she was instructed to leave Defendant's campus, and forced to take online classes. All Class Members have been completely or partially denied refunds for tuition, fees, room and/or board.

127.    The relief Plaintiff seeks is typical of the relief sought for the other Class members. Further, there are no defenses available to Defendant that are unique to Plaintiff.

### Adequacy: Fed. R. Civ. P. 23(a)(4)

128.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting class actions.

129.    Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class. Neither Plaintiff nor counsel has interests adverse to those of the Class.

**Superiority: Fed. R. Civ. P. 23(b)(3)**

130.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and fact regarding Defendant's conduct and responsibility predominate over any questions affecting individual Class members.

131.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by the Class would be significant, making class adjudication the superior option. Furthermore, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.

132.    Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

133.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, any challenge of managing this action as a class action is substantially

outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment, making class adjudication superior to other alternatives.

134.    Moreover, Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

**Certification of Specific Issues: Fed. R. Civ. P. 23(c)(4)**

135.    To the extent that the Class described herein do not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiff seeks certification of issues that will drive the litigation toward resolution.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
(Plaintiff and Other Members of the Class)

136.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

137.    Plaintiff brings this count on behalf of herself and other members of the Class.

138.    Plaintiff's and the other members of the Class's relationship with Defendant was contractual in nature.

139.    Defendant's numerous promises, offers, and commitments, specifically detailed and implied by the allegations *supra*, paragraphs 25-85, are derived from BU's statements on its website and in its handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials. Defendant also publishes a number of mandatory fees on its website and

academic catalogs, and (as discussed above) specifically described the amount, nature and intended purpose of each fee.[94]

140.    These statements and terms formed the basis of the contract, or otherwise imply the existence of a contract, Plaintiff and the other members of the Class entered into with the University. Plaintiff and the other Members of the Class agreed to pay tuition, mandatory fees, and room and/or board costs as students or on behalf of students and, in exchange, Defendant enrolled those students and admitted them to campus, granting them the full rights and privileges of student status, including but not limited to access to campus facilities, access to campus activities, and live, in-person instruction in a physical classroom, the services, benefits, programs supported by the mandatory fees, as well as room and board.

141.    The University could reasonably foresee that students would rely on the many specific promises on its website and in its handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials, and expect that, in exchange for the benefit conferred on the University in the form of payments of tuition, fees, and room and board, students would be physically present on campus and fully enjoy the facilities, services, and opportunities campus provides, including its location in Boston and the surrounding opportunities within the city.

142.    Upon information and belief, prior to January 20, 2020 there were no references or disclaimers in any of Defendant's website pages, handbooks, policy manuals, brochures, catalogs, advertisements, or other promotional materials to the possibility of in-person classes being moved

---

[94] *Id.*

fully online, to student activities being suspended indefinitely, or to premature school-wide closures of student housing for any reason whatsoever.[95]

143.    The parties' course of conduct prior to March 2020 further demonstrates that Defendant offered instruction specifically on the physical campus and Plaintiff and the Members of the Class reasonably expected to receive instruction in that manner.

144.    Those classes for which students expected to receive in-person instruction began in the Spring 2020 semester by offering in-person instruction.

145.    Each day for the weeks and months leading up to the announced closure of the campus, students attended physical classrooms to receive in-person instruction, and Defendant provided such in-person instruction.

146.    Likewise, students were provided with syllabi and other documents that referenced class meeting schedules, locations, and physical attendance requirements.

147.    Each day for the weeks and months prior to announced closures, students had access to the full campus, along with its attendant services, benefits, and programs, as well as access to student housing.

148.    Defendant offered two distinct educational services, the first as a live, in-person, on-campus education, with all its attendant facilities and services, and a second as an online distance education. Defendant considered these services to be distinct, with different market values. Defendant also offered access to services, benefits and programs secured by mandatory fees, as well as access to student housing secured by payments for the same.

---

[95] January 20, 2020 is the date that students were permitted to withdraw from the University for the Spring 2020 term and receive a full refund on tuition and fees. January 21, 2020-February 3, 2020 is the timeframe that students were permitted to withdraw from the University for the Spring 2020 term and receive a full tuition refund. After February 19, 2020, no refund would be given whatsoever.

149.    Plaintiff and the members of the Class accepted that offer by paying valuable consideration, in the form of (a) tuition, and attended classes in person during the beginning of the Spring 2020 semester, (b) mandatory fees, for which students expected to receive access to the benefits, services, and programs secured by those fees, and/or (c) student housing costs, for which students expected to receive access to such housing.

150.    However, after accepting such consideration from Plaintiff and other members of the Class, Defendant provided materially different services, cut off access, and curtailed or eliminated programs, thereby depriving Plaintiff and other members of the Class of the benefit of the bargain for which they had paid.

151.    The University breached the contract with Plaintiff and other members of the Class by moving all classes for the Spring 2020 semester to online distance learning platforms and restricting or eliminating the on-campus experience, cancelling most student activities and constructively evicting students from their student housing as of March 16/17, 2020 (when BU instructed students to vacate the campus no later than March 22, 2020 but "sooner if possible,[96]"), without any reduction or refund of tuition, mandatory fees, and/or student housing costs.

152.    Defendant retained tuition, fees and/or student housing monies paid by Plaintiff and other members of the Class, without providing them the full benefit of their bargain.

153.    Plaintiff and other members of the Class have suffered damage as a direct and proximate result of Defendant's breach amounting to the difference in the fair market value of the services and access for which they contracted, and the services and access which they actually received.

---

[96] https://www.bu.edu/president/message-from-president-brown-covid-19-update/.

154.    As a direct and proximate result of Defendant's breach, Plaintiff and other members of the Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the difference between the fair market value of (a) the online learning provided versus the fair market value of the live, in-person instruction in a physical classroom on a physical campus, (b) the attendant benefits, services, programs and/or (c) student housing for which the parties contracted.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(Plaintiff and Other Members of the Class)**

155.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

156.    Plaintiff brings this claim on behalf of herself and on behalf of the members of the Class against Defendant.

157.    Plaintiff pleads this Count in the alternative to the First Cause of Action above.

158.    Plaintiff and Class Members entered into an implied contract by accepting Defendant's offer to register for on-campus classes and use of Defendant's facilities in accordance with Defendant's usual and customary practice of providing on-campus courses.

159.    Under the implied contract, Plaintiff and Class Members registered for on-campus courses.

160.    It was the reasonable expectation of Plaintiff and Class Members that Defendant would provide them with on-campus—as opposed to online—classes and instruction and use of Defendant's facilities as mutually agreed and intended in accordance with Defendant's publications including, brochures, advertisements, and other promotional materials and Defendant's usual and customary practice of providing on-campus courses.

161.    Plaintiff and Class Members accepted and intended to use and enjoy Defendant's on-campus classes and facilities.

162.    Plaintiff and Class Members have fulfilled all expectations of their mutual agreement, by registering and paying for on-campus courses and access to on-campus facilities and services for the Spring 2020 semester. Plaintiff and Class Members have paid Defendant for all Spring 2020 semester financial assessments.

163.    However, Defendant breached the implied contract, failed to provide those on-campus classes and/or services, and has not otherwise performed as obligated and required by the implied-in-fact contract between Plaintiff and Class Members and Defendant. Defendant moved all classes to online classes, restricted or eliminated Class Members' ability to access university facilities, and/or evicted Plaintiff and Class Members from campus housing. In doing so, Defendant has deprived and continues to deprive Plaintiff and Class Members from the benefit of their bargains with Defendant.

164.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's breach. The online classes provided by Defendant are objectively different from and less valuable than the on-campus classes for which the parties entered into an implied contract.

165.    Plaintiff and Class Members are entitled to damages, including but not limited to tuition refunds, fee refunds, and/or room and board refunds.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
(Plaintiff and Other Members of the Class)

166.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

167.    Plaintiff brings this count on behalf of herself and other members of the Class.

168.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in the First and Second Causes of Action above.

169.    The elements of a claim for unjust enrichment are (1) the Plaintiff conferred a benefit upon the Defendant; (2) the Defendant's appreciation or knowledge of the benefit; and (3) the Defendant's acceptance or retention of the benefit under the circumstances would be inequitable.

170.    Plaintiff and other members of the Class conferred a benefit on Defendant by paying (a) substantial tuition for live, in-person instruction in physical classrooms on a physical campus with all of the attendant benefits, (b) mandatory fees for particular services, programs, and benefits, and/or (c) student housing payments for access to student housing.

171.    Defendant appreciated and had knowledge of this benefit by accepting payment of such monies.

172.    However, Plaintiff and other members of the Class did not receive the full benefit of their bargain.

173.    Instead, Plaintiff and other members of the Class conferred this benefit on Defendant in expectation of receiving live, in-person instruction in a physical classroom along with the experience of on-campus life as described more fully above, but they were provided with a materially different service, i.e. online instruction devoid of the on-campus experience, access, programs, services, and/or student housing for which they had paid.

174.    As indicated above, online-only instruction, particularly when devoid of on-campus experience, access, and services, is an educational service of materially different and lower value than the in-person educational services for which Plaintiff originally agreed to pay.

175.    Defendant has retained this benefit of payment, even though Defendant has failed to provide the educational services, programs, benefits and student housing for which these payments were collected, making Defendant's retention unjust under the circumstances.

176.    As discussed above, Defendant's campus closure and moving classes online allowed it to save significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced staffing requirements and payroll costs, reduced or eliminated hours for paid work study students, and otherwise.

177.    It is significantly cheaper to operate a remote, on-line campus than a fully open physical campus. But even if it were not, it is not the educational service that students were offered and not the educational services, programs, benefits and/or student housing that the students expected to receive.

178.    Equity and good conscience require that Defendant return to Plaintiff and other members of the Class a portion of the monies paid.

179.    This is particularly true where, as here, Defendant is supported by a $2.3 billion endowment, while its students, on information and belief, do not have access to such immense financial resources, and further where, on information and belief, a substantial portion of its students have incurred substantial debt to finance an educational experience that they did not receive.

180.    Defendant should be required to disgorge this unjust enrichment to the extent that Defendant has retained payments beyond the value for the educational services, programs, benefits and/or student housing that Defendant actually provided.

**FOURTH CAUSE OF ACTION**
**CONVERSION**
(Plaintiff and Other Members of the Class)

181.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

182.    Plaintiff brings this count on behalf of herself and all members of the Class.

183.    The elements of conversion are (1) the defendant intentionally and wrongfully exercised control or dominion over personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

184.    Plaintiff and Class members paid, as described above, tuition, fees, and/or other charges to Defendant, for a specific fund for specific, identifiable services as set forth previously.

185.    As discussed *supra*, Defendant failed to provide the services for which Plaintiff and Class members paid such tuition, fees, and/or other charges.

186.    Defendant has intentionally wrongfully retained more than the pro-rated value for the services that Defendant actually provided, and for which Plaintiff paid.

187.    At all times above, Plaintiff and Class members properly had an ownership interest in any amount of such tuition, fees, and/or other charges that exceeded the value of the services that Defendant actually provided.

188.    Defendant's conduct has damaged Plaintiff and Class members by virtue of depriving them of such funds while failing to provide the services discussed above.

189.    Defendant refuses to remit Plaintiff's and the other Class members' reimbursement for tuition, fees, and/or other charges discussed above paid for the 2020 Spring semester.

190.    Defendant has therefore converted and continues to convert Plaintiff's and the other Class members' 2020 Spring semester tuition, fees, and/or other charges discussed *supra*.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf of members of the Class, prays for judgment in their favor and against Defendant as follows:

a.  Certifying the Class as proposed herein, designating Plaintiff as Class representative, and appointing undersigned counsel as Class Counsel;

b.  Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this action;

c.  Declaring that Defendant has wrongfully kept monies paid for tuition, fees, and on-campus housing charges;

d.  Requiring that Defendant disgorge amounts wrongfully obtained for tuition, fees, and on-campus housing charges;

e.  Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from retaining the pro-rated, unused monies paid for tuition, fees, and on-campus housing charges;

f.  Scheduling a trial by jury in this action;

g.  Awarding Plaintiff reasonable attorneys' fees, costs and expenses, as permitted by law;

h.  Awarding pre and post-judgment interest on any amounts awarded, as permitted by law; and

i.  Awarding such other and further relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated August 27, 2020           /s/ Conor McDonough

Conor B. McDonough (BBO No. 704140)

*Counsel for Plaintiff*

HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, NY 10017
T: (212) 851-6821
cmcdonough@hechtpartners.com

Kathryn Lee Boyd (*pro hac vice*)
lboyd@hechtpartners.com

Shira Lauren Feldman (*pro hac vice*)
sfeldman@hechtpartners.com